BOWLES AUTOMOTIVE, INC., PLAINTIFF v. NORTH CAROLINA DIVISION OF MOTOR VEHICLES, DEFENDANT

No. COA08-1411

(Filed 16 March 2010)

**1. Appeal and Error— preservation of issues—notice of appeal from judgment rather than summary judgment denial**

Defendant waived appellate review of an argument concerning the denial of summary judgment where it gave notice of appeal from the judgment in favor of plaintiff but not from the order denying its motion for summary judgment.

**2. Appeal and Error— preservation of issues—motions for directed verdict denied—no motion on issue appealed from**

An argument about the denial of defendant's motion for directed verdict was dismissed where defendant did not make a motion for directed verdict on the only issue that remained after the trial court granted defendant's motions for directed verdicts on other issues.

BOWLES AUTO., INC. v. N.C. DIV. OF MOTOR VEHICLES

[203 N.C. App. 19 (2010)]

**3. Appeal and Error— preservation of issues—issues conceded or not raised at trial**

Defendant did not preserve for appellate review questions of whether he was entitled to directed verdict on his *quantum meruit* claim or whether N.C.G.S. § 20-108(j) operates as a waiver of sovereign immunity. The *quantum meruit* issue was conceded and defendant did not argue waiver of sovereign immunity under this statute at trial.

**4. Motor Vehicles— storage fee for recovered stolen motorcycles—not excessive**

The trial court did not abuse its discretion by denying defendant's motion to set aside or remit the jury verdict on the argument that an award was excessive in an action for storage fees for stolen motorcycles and parts seized by the State. Although the State argued that it should be liable for storage costs only up to the filing date for the dispositional actions, the motorcycles and parts remained in storage far beyond that date and there was no evidence of a difference in storage or benefit to defendant before and after that date.

**5. Motor Vehicles— storage of recovered stolen motorcycles—fee—not limited to value of vehicle**

Plaintiff's recovery for storing stolen motorcycles and parts seized by the State was not limited by N.C.G.S. § 20-108(j) to the value of the parts and vehicles. The Legislature intended that a private garage recover reasonable compensation for services related to seizure under N.C.G.S. § 20-108 as a separate remedy from lienor rights. There is nothing in the statute or legislative history to indicate that the qualification of compensation as reasonable should tie the storage charge to the value of the vehicle.

Appeal by Defendant from order entered 23 June 2008 by Judge Theodore S. Royster, Jr. in Iredell County District Court. Heard in the Court of Appeals 8 June 2009.

*Ott Cone & Redpath, P.A., by Melanie M. Hamilton, for Plaintiff.*

*Attorney General Roy Cooper, by Special Deputy Attorney General Neil Dalton and Assistant Attorney General John W. Congleton, for the State.*

**BOWLES AUTO., INC. v. N.C. DIV. OF MOTOR VEHICLES**

[203 N.C. App. 19 (2010)]

STEPHENS, Judge.

## I.  *Procedural History and Factual Background*

### A.  *The Division's Eleven Actions*

The litigation surrounding this case began in May 2004 when, pursuant to N.C. Gen. Stat. § 20-108 (2009),[1] the North Carolina Division of Motor Vehicles ("Defendant" or "the Division") filed eleven "dispositional civil actions" in the District Court of Iredell County[2] to determine the ownership and proper disposition of stolen motorcycles and parts, which had been seized by the Division during the investigation of a motorcycle theft ring and were being held in storage by Bowles Automotive, Inc. ("Plaintiff" or "Bowles"). Plaintiff filed counterclaims in each of the eleven actions, seeking to enforce its storage lien under N.C. Gen. Stat. § 44A. In March 2006, Bowles amended its counterclaims, asserting a claim for breach of contract against the Division for failure to pay towing and storage fees to Plaintiff.

On 6 March 2007, Bowles filed a motion in district court for summary judgment on the Division's eleven actions. Judge April Wood denied Bowles' motion in an order entered 13 July 2007 finding that "neither party [was] entitled to judgment as a matter of law."

### B.  *Background of Plaintiff's Separate Claim*

On 9 May 2006, Plaintiff filed a separate lawsuit for breach of contract against Defendant, and it is this action which forms the basis for Defendant's appeal. The procedural history of Plaintiff's lawsuit is confusing at best, and it has taken an exorbitant amount of this Court's energy to decipher the record on appeal and to determine how this matter was resolved at the trial court level. The caption on Plaintiff's original complaint, "IN THE GENERAL COURT OF JUSTICE SUPERIOR COURT DIVISION[,]" indicates that Plaintiff filed its action in superior court.[3] On 26 June 2006, by a pleading entitled

---

1. N.C. Gen. Stat. § 20-108 governs procedures relating to stolen vehicles. Subparagraph (j) provides that "[a]n officer taking into custody a motor vehicle or component part under the provisions of this section is authorized to obtain necessary removal and storage services, but shall incur no personal liability for such services. The person or company so employed shall be entitled to reasonable compensation as a claimant under (e), and shall not be deemed an unlawful possessor under (a)."

2. The file numbers on the Division's eleven actions brought in district court are 04 CVD 923, 925, 926, 927, 928, 929, 930, 931, 932, 933, and 934.

3. That Plaintiff would have chosen to file its separate action in superior court, rather than district court, would have been logical, given that Plaintiff sought $483,565.00, plus interest, in damages. *See* N.C. Gen. Stat. § 7A-243 (2009) ("Except as

"Motion to Strike, Motions to Dismiss and Answer" bearing the court file number "06 CRS 1249" and indicating that the document was filed in the "Superior Court Division," Defendant responded to Plaintiff's complaint and filed motions to dismiss Plaintiff's lawsuit on the grounds: (1) of sovereign immunity; (2) that Plaintiff failed to state a claim upon which relief can be granted; (3) that Plaintiff never entered into a legally enforceable contract with the State; (4) that the statute of limitations had expired; and (5) under the doctrine of laches on the grounds of undue prejudice and unreasonable delay. Subsequent court documents contained in the record on appeal, how-ever, reveal that Plaintiff's action was eventually disposed of in dis-trict court, although no order transferring the matter from superior court to district court appears in the record.

Despite the amount of damages sought by Plaintiff, it is clear that Plaintiff's original action could have been brought in either the dis-trict court or the superior court division of the General Court of Justice. "[O]riginal general jurisdiction of all justiciable matters of a civil nature cognizable in the General Court of Justice is vested in the aggregate in the superior court division and the district court division as the trial divisions of the General Court of Justice." N.C. Gen. Stat. § 7A-240 (2007).

> For the efficient administration of justice in respect of civil mat-ters as to which the trial divisions have concurrent original juris-diction, the respective divisions are constituted proper or improper for the trial and determination of specific actions and proceedings in accordance with the allocations provided in this Article. But no judgment rendered by any court of the trial divi-sions in any civil action or proceeding as to which the trial divi-sions have concurrent original jurisdiction is void or voidable for the sole reason that it was rendered by the court of a trial division which by such allocation is improper for the trial and determina-tion of the civil action or proceeding.

N.C. Gen. Stat. § 7A-242 (2007). "It is, therefore, evident that except for areas specifically placing jurisdiction elsewhere (such as claims under the Workers' Compensation Act) the trial courts of North Carolina have subject matter jurisdiction over all justiciable matters of a civil nature." *Harris v. Pembaur*, 84 N.C. App. 666, 668, 353 S.E.2d 673, 675 (1987) (internal quotation marks omitted).

otherwise provided in this Article, . . . the superior court division is the proper division for the trial of all civil actions in which the amount in controversy exceeds ten thou-sand dollars ($10,000).").

However, the superior court and the district court are two different divisions of the General Court of Justice, and one division cannot obtain jurisdiction over a matter that originates in the other division without a resolution of some kind in the original division. Thus, for the district court to obtain jurisdiction over a superior court case, the matter would have to be transferred either by written motion of one of the parties or by the judge's own motion. N.C. Gen. Stat. §§ 7A-258, -259 (2007). Accordingly, because no order appears in the record on appeal to establish that Plaintiff's action had been transferred from the superior court division to the district court division, this Court's initial impression was that the district court had not obtained authority to dispose of this matter. *See Obo v. Steven B.,* —— N.C. App. ——, ——, 687 S.E.2d 496, 500 (2009) ("[S]ubject matter jurisdiction may not be waived, and this Court has not only the power, but the duty to address the trial court's subject matter jurisdiction on its own motion or *ex mero motu*.").

Reluctant to dismiss the appeal and further prolong a matter which has been ongoing for more than eight years, this Court eventually, after several requests, obtained the court file from the Iredell County district court to determine how an action apparently originating in superior court came to be resolved in district court without an order to transfer. A careful review of documents in the district court file which were not made a part of the record on appeal revealed that Plaintiff's action was originally filed in district court and not in superior court as the caption on Plaintiff's complaint and the Division's answer thereto indicate. It appears that several of the pleadings in this case were erroneously captioned for the superior court division, although this matter remained in the district court at all times. Thus, through extensive efforts of this Court, we ascertained that Plaintiff's case originated and was therefore properly disposed of in district court, despite the contrary indication of the record on appeal.[4] Having established that Plaintiff brought its breach of contract claim in district court, we now address the issues raised on this appeal regarding the disposition of this matter at the trial court level.

---

4. We admonish counsel for both parties to more carefully scrutinize preparation of the record on appeal so as not to waste this Court's energy and time. "Under North Carolina Rules of Appellate Procedure 7, 9, and 11, the burden is placed upon the appellant to commence settlement of the record on appeal[.]" *State v. Berryman,* 360 N.C. 209, 216, 624 S.E.2d 350, 356 (2006); *see also State v. Alston,* 307 N.C. 321, 341, 298 S.E.2d 631, 644-45 (1983) ("It is the appellant's duty and responsibility to see that the record is in proper form and complete.").

### C. Disposition of Plaintiff's Claim

In its complaint, Plaintiff alleged that at a 2 March 2006 hearing on the Division's motions to dismiss Bowles' counterclaims in the eleven dispositional matters,[5] Assistant Attorney General Jeff Edwards opined that Plaintiff's claim for payment could only be brought as a separate lawsuit outside of N.C. Gen. Stat. § 20-108. Thus, Plaintiff believed that a separate action for breach of contract was necessary to preserve Plaintiff's rights, and Plaintiff accordingly filed the current breach of contract action against the Division.

On 31 December 2007, the Division filed a motion for summary judgment on Plaintiff's breach of contract claim. Iredell County District Court Judge Jimmy Myers entered an order on 5 February 2008 denying the Division's motion for summary judgment. On 19 May 2008, the matter came on for trial by a jury in Iredell County District Court, Judge Royster presiding. The evidence presented at trial tended to show the following:

In October 2000, Division Inspector Dan Lowrance ("Lowrance") contacted Thomas Bowles, Jr. ("Tommy") regarding Plaintiff's ability to assist the Division with towing and storage of motorcycles and component parts seized in the course of the Division's investigation. Tommy informed Lowrance that his company was capable of providing the requested services, and over the next several days, Plaintiff towed and began storage of twelve motorcycles and various motorcycle frames and parts. The motorcycles and parts were housed in a storage facility on Plaintiff's premises while their origins were investigated.

Within the first two weeks that the motorcycles and parts were being stored by Bowles, Tommy asked Lowrance how to complete the ten-day reports, which are used in these cases to establish a storage lien on the stored property. Lowrance instructed Tommy not to submit the ten-day reports in this instance because the volume of reports associated with this particular investigation would overwhelm the DMV in Raleigh.

In December 2000, about 30 days after most of the motorcycles had been placed in storage, Tommy asked the Division how he was going to be paid for Bowles' services. Through Lowrance, the Division informed Tommy that they did not know how Bowles would be

---

5. The Division's motions to dismiss Plaintiff's counterclaims in the dispositional matters are not contained in the record on appeal nor is a transcript of the hearing on those motions before this Court.

paid or how long the motorcycles would need to be stored because the theft case was pending in federal court. Over the next year, Tommy repeatedly contacted Lowrance and Inspector Scott Dayvault ("Dayvault") from the Division, attempting to obtain information and instructions as to the status and disposition of the motorcycles and parts in Plaintiff's storage facility. Tommy also inquired as to payment for the towing and storage and was informed by Lowrance that Lowrance was uncertain how Bowles would be paid.

The investigation and prosecution of the criminal matter regarding the stolen motorcycles and parts eventually spanned three and a half years, and involved the Division, the Federal Bureau of Investigation ("F.B.I."), and the United States Attorney's office. During the investigation and prosecution, Dayvault was told by the F.B.I. and the United States Attorney's office not to release the motorcycles. Dayvault relayed this information to Tommy, and Bowles thus continued to store the vehicles for Defendant.

In early 2003, at the end of the Division's involvement with the prosecution of the motorcycle thefts, Dayvault told Bowles that the criminal matter remained in federal court and that, in the future, Bowles should contact the Attorney General's office for instructions regarding the motorcycles. Tommy contacted Assistant Attorney General Tracy Curtner ("Curtner") and inquired about payment for his storage services. Tommy testified that after approximately 25 to 30 conversations with Curtner, it became clear to him that payment would not be arranged. Tommy expressed to Curtner that he would like to bring the Division, Plaintiff, and the Attorney General's office before a judge to resolve the matter. Curtner informed Tommy that he could not sue the DMV, and that he would have to wait for the DMV to sue Bowles. Bowles would then be able to assert a counterclaim and pursue a lien remedy. On Curtner's recommendation, Bowles retained counsel and waited to be sued by the Division. The Division eventually filed the aforementioned eleven dispositional actions against Bowles on 8 May 2004, and the subsequent events as detailed above ensued.

At the close of Plaintiff's evidence, Defendant made a motion for directed verdict, which Judge Royster denied. Before the case was submitted to the jury, Defendant renewed its motion for directed verdict. Judge Royster partially granted the motion,[6] finding there was

6. Although Judge Royster used the term "summary judgment" in granting Defendant's motion for directed verdict as to the contract claim, it is apparent that he intended to rule on Defendant's motion for directed verdict. "The standard of review

no contract between the parties, and particularly, there was no contract for storage of the motorcycles at a specific rate of $15.00 per vehicle per day.[7] However, Judge Royster left the issue of what constitutes reasonable compensation for the storage of the vehicles under N.C. Gen. Stat. § 20-108(j) for the jury to decide.

Judge Royster instructed the jury on the following issues: (1) whether Defendant did store the motorcycles and parts with Plaintiff, (2) whether Plaintiff stored the motorcycles and parts under such circumstances that Defendant should be required to pay for those services, and (3) to what amount of reasonable compensation, if any, was Plaintiff entitled. The jury found that Plaintiff did store the motorcycles and parts for Defendant under circumstances requiring Defendant to pay for such services, and that Plaintiff was entitled to $575,725.00 in compensation. Defendant made a motion to remit or set aside the jury award and a motion for judgment notwithstanding the verdict, both of which were denied. On 23 June 2008, Judge Royster entered judgment upon the jury's verdict.

On 16 July 2008, Defendant filed its notice of appeal to this Court "from the Judgment in favor of the plaintiff[.]"

## II. Discussion

### A. Defendant's Motion for Summary Judgment

[1] Defendant first assigns error to the trial court's denial of its motion for summary judgment. However, Defendant has waived appellate review of this argument. Defendant gave notice of appeal to this Court "from the Judgment in favor of the plaintiff, entered on or about June 23rd, 2008[.]" Defendant failed to give notice of appeal from the order of the trial court entered 5 February 2008 denying its motion for summary judgment, and thus failed to comply with N.C. R. App. P. 3(d) ("The notice of appeal . . . shall designate the judgment or order from which appeal is taken and the court to which appeal is taken[.]"). Accordingly, Defendant's appeal from the trial court's denial of its motion for summary judgment is not properly before us. Defendant's argument is dismissed.

---

for a directed verdict is essentially the same as that for summary judgment." *Nelson v. Novant Health Triad Region, L.L.C.*, 159 N.C. App. 440, 442, 583 S.E.2d 415, 417 (2003). Thus, the trial court's *lapsus linguae* did not constitute prejudicial error.

7. Judge Royster ruled: "I will grant the partial directed verdict . . . that there wasn't an agreement by the defendant to pay fifteen dollars a day. I'm also . . . going to grant partial [directed verdict] as to the contract claim."   .

## B. Defendant's Motions for Directed Verdict

**[2]** Defendant next argues the trial court erred in denying its motion for directed verdict at the close of Plaintiff's evidence, and in partially denying its renewed motion for directed verdict at the close of all the evidence. Our Supreme Court has set forth the appropriate standard of review as follows:

> The standard of review of directed verdict is whether the evidence, taken in the light most favorable to the non-moving party, is sufficient as a matter of law to be submitted to the jury. When determining the correctness of the denial for directed verdict or judgment notwithstanding the verdict, the question is whether there is sufficient evidence to sustain a jury verdict in the non-moving party's favor, or to present a question for the jury. Where the motion for judgment notwithstanding the verdict is a motion that judgment be entered in accordance with the movant's earlier motion for directed verdict, this Court has required the use of the same standard of sufficiency of evidence in reviewing both motions. N.C.G.S. § 1A-1, Rule 50(a), (b) (1990).

*Davis v. Dennis Lilly Co.*, 330 N.C. 314, 322-23, 411 S.E.2d 133, 138 (1991) (internal citations omitted).

At the close of Plaintiff's evidence, Defendant made a motion for directed verdict, arguing that no contract existed between the parties, and that Plaintiff's case is barred by the statute of limitations and sovereign immunity. At the close of all evidence, Defendant renewed its "motion for a directed verdict on the issue of the contract, whether or not there was a contract here." Defendant argued that there was no meeting of the minds and that there was no agreement for storage at a rate of $15.00 per day. Defendant also renewed its defenses under the statute of limitations and sovereign immunity.

In discussing Defendant's motion for directed verdict, Judge Royster opined that while there was insufficient evidence to submit the issue of the existence of a contract under a common law contract theory to the jury, there was evidence that "there was a contract for storage [under N.C. Gen. Stat. § 20-108(j)], and [Plaintiff's] damages are going to be decided as what's reasonable, as required by 20-108 subparagraph (j)." Defense counsel further explained Defendant's motion for a directed verdict as follows:

> What I—what I think or what I'm urging, I guess, is that the motion that there is a contract be denied [sic], but that doesn't

mean the state doesn't still owe money on—under 21-108 [sic], but it's something other than a—one—108 that is something other than a contract. That it is something that is mandated by the legislature, but it's not a contract.

Agreeing that "this is a statutorily created procedure[,]" the trial court granted Defendant's motion for partial directed verdict, stating

I will grant the partial directed verdict— . . . the fact that that issue will not be submitted to the jury, that there wasn't an agreement by the defendant to pay fifteen dollars a day. I'm also . . . going to grant partial summary judgment [sic] as to the contract claim. And—but as to an action under 20-108 subparagraph (j), I'm going to let this proceed to the jury on that issue about what's a reasonable compensation for the storage of these vehicles.

On appeal, Defendant argues the trial court erred in denying its motions for directed verdict. As set out above, however, the trial court *granted* the motions Defendant made for directed verdict. Defendant did not move for a directed verdict on the issue of what compensation Plaintiff was entitled to under Section 20-108(j). After the trial court granted Defendant's motions for directed verdict on the issues of the existence of a contract and an agreement for a specific storage cost of $15.00 per day per motorcycle, the only issue that remained for the jury was what compensation, if any, Plaintiff was entitled to under N.C. Gen. Stat. § 20-108(j). As Defendant did not make a motion for a directed verdict on this issue, no appeal lies therefrom. Accordingly, Defendant's argument is dismissed.

### i. *Defense of Sovereign Immunity*

[3] Defendant also argues that it was entitled to a directed verdict because Bowles' claim for recovery in *quantum meruit* was barred by sovereign immunity. Defendant's argument is unnecessary, however, as Bowles conceded this issue at trial. In response to Defendant's motion for directed verdict at the close of all evidence, Plaintiff's counsel explained as follows: "We've talked about sovereign immunity. To the extent that there is a contract, sovereign immunity does not apply. We do agree, as indicated, that sovereign immunity would apply to a *quantum meruit* theory, and we are not advancing that as a theory." Thus, the issue of whether Plaintiff was entitled to a recovery under a theory of *quantum meruit* is not before us.

Defendant argues further, however, that it was entitled to a directed verdict because N.C. Gen. Stat. § 20-108(j) does not operate as a waiver of sovereign immunity, and thus, that Plaintiff's recovery under section 20-108(j) is barred by sovereign immunity. Defendant has also waived appellate review of this issue. At trial, Defendant did not argue that Plaintiff's claim under N.C. Gen. Stat. § 20-108(j) was barred by sovereign immunity. In fact, Defendant acknowledged that the State may owe Plaintiff "money" under section 20-108(j). Specifically, defense counsel argued:

> [W]hat I'm urging, I guess, is that the motion that there is a contract be denied [sic], but that doesn't mean the state doesn't still owe money on—under 21-108 [sic], but it's something other than a—one—108 that is something other than a contract. That lit is something that is mandated by the legislature, but it's not a contract.

Furthermore, on appeal, Defendant addresses the defense of sovereign immunity only as it applies to the denial of Defendant's motion for summary judgment, which we held above was not properly before us. Accordingly, Defendant has not preserved this argument for our review.[8]

*C. Defendant's Motion to Set Aside or Remit Jury Verdict*

[4] By its final argument, Defendant assigns error to the trial judge's denial of its motion to set aside or remit the jury verdict. Defendant argues the jury award of $575,725.00 was excessive and was not "reasonable compensation" as contemplated under N.C. Gen. Stat. § 20-108(j). We disagree.

"[A]n appellate court's review of a trial judge's discretionary ruling either granting or denying a motion to set aside a verdict and order a new trial is strictly limited to the determination of whether the record affirmatively demonstrates a manifest abuse of discretion by the judge." *Worthington v. Bynum*, 305 N.C. 478, 482, 290 S.E.2d 599, 602 (1982). When reviewing a jury's award, the appellate courts will not interfere with the judge's discretion unless "the amount

---

8. In its brief on appeal, Defendant also states that Plaintiff's claim is barred by the statute of limitations. Defendant raised this defense in its answer and, at trial, defense counsel stated that he "would also like to continue to assert . . . everything in the pleadings, including sovereign immunity and· also statute of limitations." However, Defendant has not argued the defense of the statute of limitations on appeal. Accordingly, Defendant has likewise waived review of this argument. N.C. R. App. P. 28(b)(6).

awarded is clearly or grossly excessive." *Hulin v. W. Union Tel. Co.*, 185 N.C. 470, 472, 117 S.E. 588, 590 (1923).

### ii. Duration of Storage

In arguing that the jury award was grossly excessive, Defendant contends it should be liable only for storage costs up to the filing date for the dispositional actions. In support of this contention, Defendant quotes *Thompson-Arthur Paving Co. v. Lincoln Battleground Assocs.*, 95 N.C. App. 270, 382 S.E.2d 817 (1989), for the proposition that damages are limited to the "reasonable value of materials and services accepted by and that benefit the defendant." *Id.* at 281, 382 S.E.2d at 823. Remarkably, Defendant argues its benefit terminated at the filing date of the dispositional actions.

However, the facts reveal that the motorcycles and parts remained in storage at Plaintiff's facility far beyond the filing date of the dispositional actions. Because there exists no evidence or explanation as to the difference in the manner of storage or benefit to Defendant before and after the filing date of the Division's dispositional actions, we conclude that the storage costs accrued to Defendant beyond the filing date of such actions.

### iii. Plaintiff's Recovery Under N.C. Gen. Stat. § 20-108(j)

[5] Defendant next argues that section 20-108(j), and specifically the language entitling a storage company to "reasonable compensation as a claimant under (e)," limits Plaintiff's recovery to the value of the parts and vehicles stored in Plaintiff's facility.

N.C. Gen. Stat. § 20-108(j) provides that

[a]n officer taking into custody a motor vehicle or component part under the provisions of this section is authorized to obtain necessary removal and storage services, but shall incur no personal liability for such services. The person or company so employed shall be entitled to reasonable compensation as a claimant under (e), and shall not be deemed an unlawful possessor under (a).

N.C. Gen. Stat. § 20-108(e) provides that

[n]othing in this section shall preclude the Division of Motor Vehicles from returning a seized motor vehicle or component part to the owner following presentation of satisfactory evidence of ownership, and, if determined necessary, requiring the owner to

obtain an assignment of an identification number for the motor vehicle or component part from the Division of Motor Vehicles.

With no case law presented to support or undermine the Division's contention, we turn to the history of the statute to inform our interpretation of the statutory language. Before its amendment in 1983, section 20-108 read as follows:

> Any person who knowingly buys, receives, disposes of, sells, offers for sale, conceals, or has in his possession any motor vehicle, or engine or transmission removed from a motor vehicle, from which the manufacturer's serial or engine number or other distinguishing number or identification mark or number placed thereon under assignment from the Division has been removed, defaced, covered, altered, or destroyed for the purpose of concealing or misrepresenting the identity of said motor vehicle or engine is guilty of a misdemeanor, and upon conviction shall be punished by a fine of not more than one thousand dollars ($1,000) or imprisonment, or both, in the discretion of the court.

N.C. Gen. Stat. § 20-108 (1978).

The committee notes discussing section 20-108 show that, prior to the amendment, the Division was storing abandoned vehicles with private garages at a charge to the State. 16 March 1983 *Minutes of the House Comm. on Highway Safety.* Because the Division was not selling the abandoned vehicles due to the lack of authority to do so, the costs of vehicle storage before 1983 were obviously unrelated to the sale value of the vehicle. While the purpose of the amendment was to curb the Division's storage costs by allowing the sale of abandoned vehicles to avoid payment of storage costs in perpetuity, nothing in the statute's history suggests that the storage costs incurred before sale would be limited to the proceeds from the public sale of the abandoned vehicles. *See id.* In fact, committee members stated that the revenue from the sale of such vehicles would go to the "public school fund of the State." 30 March 1983 *Minutes of the House Comm. on Highway Safety.* We conclude that the history and purpose of section 20-108 does not support Defendant's contention that storage fees must be limited to the value of the stored property.

Further, a logical reading of "reasonable compensation as a claimant under (e)" does not lead this Court to the conclusion that section 20-108(j) caps Plaintiff's recovery at the value of the motorcycles and parts. Although the language "as a claimant under (e)" raises the inference that the garage owners could claim for their fees

at the disposition hearings, this Court is unwilling, for the following reasons, to stretch that inference into a statutory interpretation whereby Plaintiff's entitlement to reasonable compensation is limited to the value of the vehicles and components stored. There is no mention of "claimants" in section 20-108(e), and it appears that subsection (e) does not reasonably relate to subsection (j).[9] All other references to "claimants" in section 20-108 involve "claimants to the property whose interest or title is in the registration records in the Division of Motor Vehicles." N.C. Gen. Stat. § 20-108(c), (d), (f). In other words, claimants are those persons who can establish an ownership interest in the seized property. It seems obvious that garage owners who are storing seized property for the seizing entity do not qualify as "claimants" under the statutory definition.

Under the statute, claimants are entitled to notice that the property is in custody, notice of a post-seizure hearing, and a post-seizure hearing. *Id.* The fact that these claimants have a right to be heard before the vehicle is disposed of cannot be understood to limit a garage's storage fees to the value of the vehicle. We find the most logical interpretation of "reasonable compensation as a claimant under (e)" to be that when a towing and storage company has performed a service for the Division, that company has a claim to payment of the reasonable value of that service and has a right to be notified before the Division disposes of the vehicle in the event the company opts to accept title of the vehicle as payment for its service.

Defendant also argues that granting "claimant status" to garages employed by the Division limits recovery of storage fees because section 20-108 requires these garages to claim their fees through a lien remedy, which exists only up to the value of the property stored. *See* N.C. Gen. Stat. §§ 44A-2, 44A-4 (2007). Section 44A-2(d) grants a private garage authority to assert a possessory lien on stored property as follows:

---

9. Because subsection (j) references a "claimant under (e)," and because subsection (e) does not contain the term "claimant," we question whether the reference to (e) is a misprint. The 1983 amendment to N.C. Gen. Stat. § 20-108 was introduced to the General Assembly as House Bill 122. 1983 N.C. Sess. Laws ch. 592. The first draft of H.B. 122 had neither a subsection (j), nor any language from current subsection (j). *Id.* In the first draft, subsection (e) referred to notice of post-seizure hearing. *Id.* Between 30 March and 1 June 1983, H.B. 122 was redrafted into a committee substitute substantially similar to the current statute. 16, 30 March, 1 June 1983 *Minutes of the House Comm. on Highway Safety.* However, with no notes or minutes from which to ascertain exactly when (j) was added and precisely to what language or provision "as a claimant under (e)" was meant to refer, we have no instruction from the legislative history as to the meaning of that phrase.

Any person who repairs, services, tows, or stores motor vehicles in the ordinary course of the person's business pursuant to an express or implied contract with an owner or legal possessor of the motor vehicle, except for a motor vehicle seized pursuant to G.S. 20-28.3,[10] has a lien upon the motor vehicle for reasonable charges for such repairs, servicing, towing, storing, or for the rental of one or more substitute vehicles provided during the repair, servicing, or storage. This lien shall have priority over perfected and unperfected security interests.

The North Carolina General Statutes contain numerous specific cross-references to Chapter 44A, including several such references in Chapter 20. *See, e.g.*, N.C. Gen. Stat. § 20-219.3(c) (2007) ("the registered owner of such vehicle shall become liable for the reasonable removal and storage charges and the vehicle subject to the storage lien created by G.S. 44A-1 et seq."); *see also* N.C. Gen. Stat. §§ 20-28.4, -52, -161, -219.10 (2007). Furthermore, Chapter 44A was in existence when section 20-108(j) was drafted. *See* N.C. Gen. Stat. § 44A-1, *et seq.* (1976); *see also* 1983 N.C. Sess. Laws ch. 592.

"In ascertaining the intent of the legislature, the presumption is that it acted with full knowledge of prior and existing laws." *Williams v. Alexander County Bd. of Educ.*, 128 N.C. App. 599, 603, 495 S.E.2d 406, 408 (1998). Further, "[o]ne of the long-standing rules of [statutory] interpretation and construction in this state is *expressio unius est exclusio alterius*, the expression of one thing is the exclusion of another." *Mangum v. Raleigh Bd. of Adjustment*, —— N.C. App. ——, ——, 674 S.E.2d 742, 747 (2009). Applying such principle here, because the language of section 20-108(j) specifically references only section 20-108(e), that language cannot be construed as a reference to another statute not specifically mentioned, especially when the drafters were presumed to have been aware of that other statute. *See Mangum*, —— N.C. App. at ——, 674 S.E.2d at 747; *see also Hunt v. N.C. Reinsurance Facility*, 302 N.C. 274, 290, 275 S.E.2d 399, 407 (1981) (statute supplying one procedure for accomplishing an objective necessarily excludes any other procedure).

We therefore conclude that the Legislature did not intend for the person or company that stores a motor vehicle under N.C. Gen. Stat. § 20-108(j) to recover reasonable compensation for its services by way of lienor rights under N.C. Gen. Stat. § 44A-2(d). Ac-

---

10. N.C. Gen. Stat. § 20-28.3 (2007) provides for the seizure of a motor vehicle that is driven by a person who is charged with an offense involving impaired driving.

cordingly, we find that section 20-108(j) created a new remedy, separate from the Chapter 44A lien remedy, which entitles a private garage to reasonable compensation for services related to seizure under section 20-108.

This conclusion is further supported by the difference in the fundamental nature of the possessory interest under section 20-108 and under Chapter 44A. That is, under the lien statutes, the garage/possessor is holding the vehicle *against the rightful owner as security for payment* for services, whereas under the seizure statute, the garage/possessor is storing the vehicle *at the request of the Division in exchange for payment* for the requested storage. N.C. Gen. Stat. §§ 20-108, 44A-1, *et seq.* While Plaintiff may have enforced his lien on the property against Defendant when Defendant defaulted on its obligation to pay storage charges, we decline to hold that Plaintiff's sole method of recovery is through enforcement of its possessory lien. *See* N.C. Gen. Stat. § 44A-4(a) ("when property is placed in storage pursuant to an express contract of storage, . . . the lienor may bring an action to collect storage charges and enforce his lien at any time within 120 days following default on the obligation to pay storage charges"). Accordingly, we hold that the language in section 20-108(j) does not limit Plaintiff's recovery for unpaid storage costs to the value of the vehicles and parts stored.

Likewise, there is nothing in the statute or legislative history to indicate that the qualification of compensation as "reasonable" should tie the storage charge to the value of the vehicle. The legislative history is bare of any meaning associated with this term. With no legislative guidance for the reasonableness requirement, we decline to limit Plaintiff's right to an adequate recovery by overturning the jury's factual determination of damages and then labeling the trial judge's decision, made in his sound discretion, a substantial miscarriage of justice. In this case, we conclude that the judge correctly left for the jury the factual determination of reasonable compensation. We further conclude that the trial judge's decision not to set aside the jury verdict did not amount to an abuse of his discretion.

In affirming the trial judge's decision not to overturn the jury's verdict, we find enlightening the following discussion by our Supreme Court in *Smith v. State*, 289 N.C. 303, 222 S.E.2d 412 (1976), regarding the impact of its decision to allow the State to be held liable for breach of contract:

We do not apprehend that this decision will result in any unseemly conflict between the legislative and judicial branches of

the government. Nor do we anticipate that it will have a signifi-
cant impact upon the State treasury or substantially affect official
conduct. Past performance convinces us that when the State has
entered into a contract, the officials who made it intended that
the State would keep its part of the bargain. It has been the pol-
icy of this State to meet its valid obligations, and we foresee no
change in that policy. The purpose of this decision is to imple-
ment the policy and to provide a remedy in exceptional situations
where one may be required.

. . . .

The State is liable only upon contracts authorized by law. When it
enters into a contract it does so voluntarily and authorizes its lia-
bility. Furthermore, the State may, with a fair degree of accuracy,
estimate the extent of its liability for a breach of contract. On the
other hand, the State never authorizes a tort, and the extent of
tort liability for wrongful death and personal injuries is never pre-
dictable. With no limits on liability jury verdicts could conceiv-
ably impose an unanticipated strain upon the State's budget.

*Id.* at 321-22, 222 S.E.2d at 424.

While the verdict herein could conceivably impose a strain upon
this State's already tightened budget, we can hardly find this verdict
to be an unanticipated one. In 2000, the Division and its officers
entered into this agreement with Plaintiff voluntarily and as autho-
rized by the General Assembly. While there was no specific agree-
ment as to the price term of the contract, the State was put on notice
by Plaintiff as to the cost of storage at its facility. At all times during
this affair, State officials and officers were aware that hefty storage
costs were mounting, yet did nothing to lessen the future burden on
the State. That the officers did not know how the obligation would be
fulfilled is of no moment. Of even less significance is the fact that the
Division often hired businesses who performed the requested serv-
ices at no cost to the State. Such testimony falls grimly short of evi-
dencing a waiver of storage costs by Plaintiff. The evidence tends to
show that the Division was accruing costs between October 2000 and
May 2008 and, rather than removing the parts and vehicles from
Plaintiff's storage facility, the Division, instead, apparently hoped it
would simply be able to avoid its obligations in the end.

In its complaint, Bowles contends that in June 2004, when
Bowles' eleven counterclaims in the Division's dispositional actions

were filed, the lien remedy Bowles was seeking could have been satisfied by the $50,000.00 estimated auction value for the motorcycles and parts in storage, at no cost to the Division. By contrast, Bowles alleges that the estimated storage fees as of June 2004 were already in excess of $300,000.00. Bowles contends that following the Division's motions to dismiss Bowles' eleven counterclaims, filed 27 June 2004, the Division made no effort to retrieve the motorcycles from Bowles or to otherwise mitigate storage costs that continued to accrue daily. As of 6 January 2006, Bowles estimated the total storage costs at $483,565.00, as well as additional payments for services rendered after that date based on a rate of $15.00 per day per motorcycle or part. Despite these allegations, the Division left the motorcycles and parts in storage with Plaintiff.[11]

At trial, Tommy testified that Bowles' standard towing rate in 2000 was $50.00 per vehicle. Tommy also testified that Bowles' typical fee for outside storage was $15.00 per part per day, and that Tommy had expressed to Lowrance that he would agree to that same rate for inside storage. Additionally, Wes Edmiston, the president of a vehicle towing and storage company in Troutman, North Carolina, testified on behalf of Bowles that in 2000 his company charged $100.00 for towing a vehicle and $15.00 per part per day for storage. Although Dayvault testified that he was not aware of Bowles' daily rate for storage, Dayvault admitted that as early as February 2001, he was aware that storage fees were accumulating rapidly.

While this Court is reluctant to render a decision which results in the people of North Carolina covering Plaintiff's more than half-

---

11. In a letter dated 24 October 2007, the Division offered to take possession of the motorcycles and parts, stating that such action "would not affect any liens [Bowles] has on the motorcycles." Prior to that date, the Division made no attempt to limit the costs that were accruing. When the Division finally attempted to mitigate the costs of storage, Bowles refused to relinquish possession of the motorcycles and parts unless its rights were "adequately protected." Bowles proposed that the Division pay the amount of the lien into court as a bond per N.C. Gen. Stat. § 44A-4(a) ("The owner or person with whom the lienor dealt may at any time following the maturity of the obligation bring an action in any court of competent jurisdiction as by law provided. . . . The clerk may at any time disburse to the lienor that portion of the cash bond, which the plaintiff says in his complaint is not in dispute, upon application of the lienor. The magistrate or judge shall direct appropriate disbursement of the disputed or undisbursed portion of the bond in the judgment of the court."). Bowles invited the Division to propose any other method it knew of that would protect Bowles' rights if the motorcycles and parts were released to the Division. As far as the record before this Court reflects, the Division never responded to Bowles' request. The Division's actions are puzzling at best, as an astounding portion of the costs that accrued while the motorcycles and parts remained in storage could have been avoided.

million-dollar storage bill,[12] this Court is bound by the uncontroverted evidence that agents of this State ran up an eight-year tab at Plaintiff's expense and then, after a *de minimus* effort at best to mitigate costs, attempted to shirk its financial obligations.

Based on N.C. Gen. Stat. § 20-108(j) and the circumstances of this case, we hold that the trial judge did not abuse his discretion in denying Defendant's motion to set aside the jury verdict. Accordingly, the order of the trial court is

AFFIRMED.

CHIEF JUDGE MARTIN and JUDGE HUNTER, JR. concur.

---

12. We note that the jury's verdict is far less than it would have been if the jury had applied the $15.00 per part per day rate to the 25 motorcycles and parts that were in Bowles' possession at the time of trial. Applying the $15.00 rate for the storage of 25 motorcycles and parts over a period of seven and a half years equates to a storage fee of $1,026,375.00. This sum excludes the towing costs which were incurred and is nevertheless almost double the jury's award of $575,725.00.